# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

RAFAEL SANCHEZ,                    )

     PLAINTIFF,                    )

VS.                    )                    2:10-cv-244-JHH

LYNNEICE ALLUMS, et al.,          )

     DEFENDANTS.                    )

## MEMORANDUM OF DECISION

The court has before it three motions for summary judgment.  The first motion (Doc. # 57) is that of Defendant Ron Eddings, the second (Doc. #58) is that of Defendant Jeffrey Hannah, and the final motion for summary judgment (Doc. #59) is that of Defendant Kevin Owens.  Pursuant to the court's May 5, 2011 and May 16, 2011 orders (Docs. # 62 & 35), the motions were deemed submitted, without oral argument, on June 10, 2011.

## I. Procedural History

Plaintiff Rafael Sanchez commenced this action on February 1, 2010 by filing a Complaint in this court alleging the following: false arrest (Count One), false imprisonment (Count Two), malicious prosecution (Count Three), improper policies and customs and procedures (Count Four), failure to properly train (Count Five),

negligent retention (Count Six), state law false imprisonment (Count Seven), state law false arrest (Count Eight), invasion of privacy (Count Nine), vicarious liability (Count Ten), and negligence (Count Eleven) against the Jefferson County Sheriff's Department,[1] Lynneice Allums (individually and in her capacity as an officer of the Jefferson County Sheriff's Department), Jefferson County, Alabama, and the Jefferson County Commission. According to the Complaint, the claims are "authorized and instituted pursuant to 42 U.S.C. Section 1983" and include supplemental state law torts. (See Compl. at 2, ¶ 3). Plaintiff Sanchez seeks damages allegedly suffered as a result of Defendants' acts of malice and reckless indifference. (See Compl. at 15).

On February 11, 2010, Defendants Jefferson County Commission and Jefferson County filed a Motion to Dismiss (Doc. #9). The next day, Defendant Lynneice Allums filed a Motion to Dismiss (Doc. #12), contending that she has sovereign immunity under the Eleventh Amendment as to all claims asserted against her in her official capacity, qualified immunity to the federal claims asserted against her in her individual capacity, and absolute immunity under Alabama law as to the state law claims. (See Doc. #12). On March 17, 2010, the court granted in full the Motion to

---

[1] On February 9, 2010, the Jefferson County Sheriff's Department filed a Motion to Dismiss (Doc. #3), which was granted by court order (Doc. #8) dated February 11, 2010.

Dismiss Defendants Jefferson County Commission and Jefferson County. (Doc. #18.) In that same order, the court granted in part and denied in part the Motion of Defendant Allums, with the only claims remaining being the federal claims asserted against her in her individual capacity.[2]  (Id.)  The court allowed Plaintiff the opportunity to amend his complaint to properly craft a complaint against Deputy Allums in her individual capacity.  (Id.)

Thereafter, on March 31, 2010, Plaintiff filed an Amended Complaint (Doc. #20) against Defendant Allums.  The Amended Complaint sued Allums in her individual capacity, as an officer of the Jefferson County Sheriff's Department and contained the following claims: false arrest (Count One); false imprisonment (Count Two); malicious prosecution (Count Three); improper policies and customs and procedures (Count Four); and failure to properly train (Count Five).

After some discovery was conducted, Plaintiff moved to again amend his complaint to add four new defendants.  (See Doc. #29.)  The court granted the motion (see Doc. # 30), and Plaintiff filed his Second Amended Complaint (Doc. #31) on

---

[2]  All claims asserted against Defendant Allums in her official capacity were dismissed on the basis of sovereign immunity under the Eleventh Amendment, and all state law claims against her in her individual capacity were dismissed on the basis of absolute immunity under the Alabama Constitution.  (See Doc. #18.)

July 30, 2010.  The Second Amended Complaint contained the same five counts[3] but added the following four defendants, in addition to Defendant Allums: Defendant Deputy Kevin Owens, Defendant Deputy Jeffrey Hannah, Defendant Chief Deputy Randy Christian and Defendant Captain Ron Eddings.  (Id.)

On August 24, 2010, Defendant Chief Deputy Randy Christian filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. #38).  The Motion and attached affidavit informed the court that Chief Deputy Christian was not Chief Deputy in November 2008 when the alleged events that gave rise to this lawsuit allegedly occurred, nor was he during the relevant time period employed in a position that involved the development of, implementation of, or training regarding policies, procedures, or customs regarding arrests or incarceration.  (Id.) On August 25, 2010, the court stated that it intended to grant the motion unless Plaintiff showed cause why Defendant Christian should not be dismissed.  (Doc. #39.)  After receiving no response from Plaintiff, on October 1, 2010, the court dismissed ,with prejudice, Defendant Chief Deputy Randy Christian from the Second Amended Complaint. (Doc. #40.)

About two months later, on December 3, 2010, Defendant Allums filed a

---

[3] The second count is entitled "false imprisonment and wrongful detention" but contains the same allegations.  (See Doc. #31.)

Suggestion of Bankruptcy (Doc. #46) and moved the court to stay the proceedings, as to her only.  The court granted the motion and stayed the proceedings, only as they relate to defendant Allums, pursuant to 11 U.S.C. § 362(a).  (Doc. #47.)  This stay left the following three defendants as active in the proceedings: Defendant Captain Ron Eddings; Defendant Deputy Jeffrey Hannah; and Defendant Deputy Kevin Owens.

On May 3, 2011, the three active Defendants filed separate Motions for Summary Judgment.  (Docs. # 57, 58 & 59.)   The Motions contend that there is no genuine issue of material fact and that all of Plaintiff's claims fail as a matter of law. (Id.)  Simultaneously filed with the Motions for Summary Judgment, each Defendant also filed a separate brief and evidence[4] (Docs. # 60, 61 & 62) in support of his

---

[4]  Although the Defendants submitted many of the same exhibits as evidence in support of summary judgment, the court lists them separately for clarity's sake.

Defendant Eddings submitted the following evidence in support of summary judgment: deposition of Ron. Eddings; deposition of Jeffrey A. Hannah; affidavit of Ron Eddings; Sanchez NCIC Printout; deposition of Lynneice Allums; Corrections Division Fugitive from Justice Progress Sheet; Rafael Chavez warrant; deposition of Rafael Sanchez; Warrant Management System Felony Intake and Screening Sheet; Sanchez's driver's license; and Kansas City Police Department Investigative Addendum.  (Doc. #60.)

Defendant Hannah submitted the following evidence in support of summary judgment: deposition of Jeffrey Hannah; Deputy Hannah's Interrogatory Responses; deposition of Ron Eddings; deposition of Rafael Sanchez; deposition of Kevin Owens; Sanchez Arrest Report; Sanchez's driver's license; Pl. Exh. 5 to Deputy Hannah's deposition; Raphael Chavez warrant; Sanchez Felony Intake Screening Sheet;  Deputy Owen's Interrogatory Responses; Kansas Police Department Investigative Addendum; and affidavit of Jeffrey Hannah.  (Doc. #61.)

Defendant Owens submitted the following evidence in support of summary judgment: deposition of Kevin Owens; affidavit of Kevin Owens; Jeffrey Hannah's Interrogatory Reponses; deposition of Jeffrey Hannah; deposition of Ron Eddings; deposition of Rafael Sanchez; Sanchez Arrest Report; Sanchez's driver's license; Pl. Exh. 5 to Deputy Hannah's deposition; Sanchez's Felony Intake Screening Sheet; Rafael Chavez Warrant; Deputy Owens' Interrogatory

Motion for Summary Judgment.[5]   On June 2, 2011, Plaintiff filed three separate briefs  (Docs. # 67, 68 & 69) in opposition to the Motions for Summary Judgment. Plaintiff also filed evidence[6] (doc. # 70) in opposition to Defendants' Motions for Summary Judgment.  On June 10, 2011, Defendants each filed a brief (Docs. # 71, 72 & 73) in reply to Plaintiff's oppositions.   All briefs and evidence have been considered by the court.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

Responses; and Kansas Police Department Investigative Addendum.

[5]  The court notes that all briefs and evidence are sealed because of the sensitive materials contained in the documents.  (See Docs. # 55-56.)

[6]  Plaintiff submitted the following evidence in opposition: deposition of Lynniece Allums; deposition of Jeffrey Hannah; deposition of Kevin Owens; deposition of Ron Eddings; deposition of Rafael Sanchez; Eddings Personnel Information; transcript of dispatch call; letter from MegaMet regarding Sanchez's employment; Sanchez's driver's license and social security card; Alabama Uniform Arrest Report; Investigative Addendum from Kansas; photograph of Sanchez; memo from Eddings; 11/15/2006 & 2/5/2007 e-mails; driver's license photo for Rafael Chavez-Mancilla; Jefferson County Sheriff's Department Policy on NCIC Confirmation on Outstanding Warrants; Jefferson County Arrest Procedures 5-05.70, Arresting Persons from Other Jurisdictions; Incarceration Form; Jefferson County Jail General Order 1-17, Fugitive from Justice Charges; General Order 1-1, Admission Procedures; Inmate Identification, 1-6; Booking Desk Responsibilities, 1-15-BH; Transfers and Releases, 1-17; NCIC Printout; Warrant from Wyandote County Sheriff's Department; FFJ Progress Sheet; Warrant Management System Intake Sheet; Waiver of Extradition; Affidavit/Warrant for Sanchez; Notes; District Court Final Disposition; Jefferson County Photo of Sanchez; Jefferson County Identification Card; Release Documents; and General Order 1-22.

6

and that the moving party is entitled to judgment as a matter of law." <u>Celotex Corp.</u> <u>v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. <u>See id.</u> at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. <u>See id.</u> at 324.

The substantive law will identify which facts are material and which are irrelevant. <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. <u>See Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. <u>See id.</u> at 249.

The method used by the party moving for summary judgment to discharge its

7

initial burden depends on whether that party bears the burden of proof on the issue

at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of

Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears

the burden of proof at trial, then it can only meet its initial burden on summary

judgment by coming forward with positive evidence demonstrating the absence of a

genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not

controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes

such a showing, the burden shifts to the non-moving party to produce significant,

probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its

initial burden on summary judgment in either of two ways.  First, the moving party

may produce affirmative evidence negating a material fact, thus demonstrating that

the non-moving party will be unable to prove its case at trial.  Once the moving party

satisfies its burden using this method, the non-moving party must respond with

positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden

of proof at trial can satisfy its initial burden on summary judgment is to affirmatively

show the absence of evidence in the record to support a judgment for the non-moving

party on the issue in question.  This method requires more than a simple statement

8

that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

## III. Relevant Undisputed Facts[7]

### A.  The Arrest

On November 10, 2008, Deputy Hannah, a deputy sheriff with the Jefferson County Sheriff's Office, stopped Sanchez's car for speeding while he was on his way home from work.  (Hannah Dep. at 9, 39; Sanchez Dep. at 18, 22.)  Sanchez gave

---

[7] If the facts are in dispute, they are stated in a manner most favor to the non-movant.  See Fitzpatrick, 2 F.3d at 1115.

Deputy Hannah his driver's license which states Sanchez's full name as Rafael Sanchez-Chavez.  (Sanchez Dep. at 24-25; Exh. 7 to Doc. # 61.)  His license does not show his social security number.  (Id.; Sanchez Dep. at 25.)   Deputy Hannah took Sanchez's license to his patrol car.  (Sanchez Dep. at 25.)

Back at the patrol car, Deputy Hannah gave Sanchez's diver's license information to the dispatcher to "let[] them run it to make sure [Sanchez] was clear and didn't have any warrants."  (Hannah Dep. at 44.)   The dispatcher informed Deputy Hannah that there was a felony arrest warrant for Sanchez in Kansas for rape and sodomy.  (Id. at 45-46.)  In fact, however, the felony arrest warrant was for Rafael Chavez-Mancilla; however, because of the similarities in their names, the search under Plaintiff's name, Rafael Sanchez-Chavez, brought up the arrest warrant for Rafael Chavez-Mancilla.  Sanchez, however, denied ever having been to Kansas and told Deputy Hannah that he was not the person that Kansas was looking for. (Sanchez Dep. at 30-31.)  Deputy Hannah told the dispatcher about Sanchez's denials and asked the dispatcher to confirm that Kansas law enforcement wanted Sanchez[8] and that it would extradite him.  (Hannah Dep. at 48, 54.)

At that point, the dispatcher contacted  the Kansas City Sheriff's Office about

---

[8] The court is aware that Sanchez was not the man actually wanted in Kansas.  However, at this point in time, Deputy Hannah did not know that Sanchez was not the same man wanted in Kansas.

the fugitive from Kansas named "Rafael Chavez" for whom the arrest warrant had been issued.  (Pl. Exh. 7, Dispatch Transcript at 4.)  The Kansas official asked for the date of birth and the social security number of the man the Jefferson County deputies were holding.  (Id. at 5.)  After giving the birth date and social security number of Sanchez, the Kansas official put the dispatcher on hold to "pull the hard copy" of the warrant.  (Id. at 7-8.)  A second official from Kansas then spoke to the dispatcher and stated that she had a hard copy of a warrant for "Rafael Chavez-Mancilla, a/k/a Rafael Chavez."  (Id. at 9.)  The dispatcher from Jefferson County asked if the social security number and date of birth matched.  (Id.)

The officials noted that the dates of birth matched, but the Kansas official stated that the social security number did not match any of the ones "listed as one of them that [Rafael Chavez has] ever used with an alias"  (id. at 10), but noted that there were additional identifying markers - that he had "scars, marks and tattoos."[9] (Id.)  The Kansas official reported that the man they were looking for had a "scar on the left arm, a scar on the right arm and a scar on the - I think that would be the right forearm, RF arm. . . .  He also has a scar on his left cheek."[10]  (Id. at 10-11.)  The

---

[9]  The court notes that the comment about tattoos was not relayed to the deputies at the scene and was not elaborated on by any Kansas official to the Jefferson County dispatcher.

[10]  Again, the court notes that Kansas officials did not relay any information about identifiable tattoos.

dispatcher from Jefferson County then relayed this information to the deputies on the scene, who checked for the scars and reported that he did not have any scars at all. (Id. at 12-13; Sanchez Dep. at 27.)  The Kansas official acknowledged that the man being held by the deputies had "no scars at all."  (Pl. Exh. 7, Dispatch Transcript  at 13.)

The following chart lists relevant descriptive information relayed to and from Deputy Hannah, Jefferson County Dispatch and the officials in Kansas:

| NAME | Rafael Chavez-Mancilla a/k/a Rafael Chavez | Rafael Sanchez Chavez |
|---|---|---|
| SEX | Male | Male |
| RACE | Hispanic | Hispanic |
| DOB | October 24, 1967 | October 24, 1967 |
| SSN | (multiple) | (different) |
| HEIGHT | 5'7" | 5'6" |
| WEIGHT | 180 pounds | 150 pounds on driver's license 185 pounds when weighed[11] |
| HAIR COLOR | Black | Black |
| EYE COLOR | Brown | Brown |

---

[11]   The physical description on Sanchez's driver's license gave a weight of 150 pounds, (Pl. Exh. 7, Dispatch Transcript at 13), but when Sanchez was weighed at the Jefferson County Jail, his weight was 185 pounds.  (Hannah Ex. 9.)

| SCARS | Left arm<br>Right Arm<br>Right forearm<br>Left | No scars |
|---|---|---|
| TATTOOS | No information | No information |

The conversation between the dispatchers then turned to whether or not the Jefferson County deputies should "cut him loose" because of the differences reported.(Id. at 13-14.) The Kansas official stated that she needed to talk to her sergeant and put the dispatcher from Jefferson County on hold. (Id. at 14.) After some time, the second Kansas official came back on the line and the Jefferson County dispatcher asked if there was any way for Kansas to send them a picture. (Id.) The dispatcher was again put on hold and later told that the supervisor from Kansas was going to speak with her. (Id. at 15.)

After another period of time on hold, a third official from Kansas got on the line with the dispatcher from Jefferson County. (Id. at 15-17.) The dispatcher again asked for a picture of the wanted fugitive, and gave the Kansas official her e-mail address where they could send the picture if they found one. (Id. at 17.) The Jefferson County dispatcher reminded the Kansas official that they needed to decide soon whether to extradite Sanchez because the deputies stated that they could "not hold him for much longer. (Id. at 18.) The Kansas official said that they would call

back with a decision within the next ten (10) minutes. (Id. at 18-19.)

Some time later, a fourth official from Kansas called the Jefferson County dispatcher and stated "We want 'em – we did want them to arrest on it." (Id. at 19.) The dispatcher relayed the message to a "male speaker"[12] that "Kansas just called. They do want him taken into custody." (Id. at 29.) The deputy asked if they were able to send a picture, to which the dispatcher responded in the negative. (Id.) The deputy asked the dispatcher to forward any e-mail of a picture of the wanted fugitive to his phone so they could compare them. (Id. at 29.) The dispatcher stated that she would check again on a picture. (Id.) After a few more minutes, the female dispatcher gets back on the line with the deputy and states that the "Kansas City Sheriff's Office is stating they do not have a picture, but they still want him." (Id. at 30-31.) The deputy replies that they have "him in custody" and the call ends. (Id. at 31.)

## B.  Booking, FFJ Warrant and Incarceration

At that point, Sanchez was arrested, handcuffed, and Deputy Kevin Owens[13] transported him to the Jefferson County jail. (Owens Dep. at 70-71.) Once at the jail,

---

[12] The transcript does not identify the male speaker, but from the context of the conversation, the "male speaker" seems to be one of the deputies on the scene with Sanchez. (Pl. Exh. 7, Dispatch Transcript at 29-31.)

[13] The record in unclear when Deputy Owens got to the scene. He does not have any recollection of the incident, including transporting Sanchez to the jail. (Owens Dep. at 69-70.)

14

Deputy Owens completed the booking slip for Sanchez. (Id. at 93-96.) Sanchez was booked into the jail based on the NCIC printout showing Kansas' commitment to extradite him.[14] (Eddings Dep. at 62-64.) Sanchez did not speak, or have any interaction with, Deputy Owens or Deputy Hannah after he was taken to the Jefferson County Jail. (Sanchez Dep. at 39-40.) Throughout Sanchez's time in custody he maintained that he was not the man wanted in Kansas. (Id. at 39, 41.)

Defendant Deputy Lynneice Allums, the person responsible for processing Fugitive from Justice (FFJ) warrants for the Jefferson County Jail, received the NCIC printout the day after Sanchez was arrested, on November 11, 2008, because she was not on duty that night. (Allums Dep. at 17-20, 90-91.) She remembered looking at the NCIC printout to confirm that Kansas stated that it would extradite Sanchez. (Id. at 91.) Next, Allums began looking for all the information she needed to complete the FFJ packet on Sanchez. (Id. at 97.) She went to the jail file to review the information on Sanchez, but she did not see or speak to Sanchez. (Id. at 88, 97-99.) On the FFJ packet, Allums used the name "Rafael Chavez" and other information on the computer inputted at the time of booking. (Id. at 98-99.)

---

[14] At this point, Jefferson County did not have the actual fugitive warrant from Kansas, but instead had the NCIC Printout showing the agency issuing the warrant, the warrant number, the bond amount, and the agency's intent to extradite. (Eddings Dep. at 33-35; NCIC Printout.) The Jefferson County Jail did not receive the warrant until approximately November 17, 2008. (See Warrant.)

15

After Allums completed the FFJ sheet, she called Kansas City to get "a certified stamp copy of the warrant." (Id. at 100.)  This all occurred on November 11, 2008, the day after Sanchez's arrest. (Id. at 109.)  At this point, Allums had to wait for a fax of the warrant, and there was some delay.  (Id. at 101.)  Allums did not know why Kansas delayed in sending her the warrant, but she did not receive it until November 17, 2008, seven days after Sanchez was arrested and incarcerated.[15]  (Id. at 101-102; see also Warrant.)  Allums did not speak with anyone regarding the delay in obtaining the Kansas warrant.  (Allums Dep. at 102-03.)

After Allums received the warrant from Kansas on November 17, 2008, she took the Kansas warrant, along the other information provided by Kansas, to the District Attorney's office screening unit where a clerk and an attorney are supposed to look over the information and determine whether there is sufficient evidence to issue a FFJ warrant.  (Allums Dep. at 80-81, 102-03; Eddings Dep. at 44.)  Once the

---

[15] Plaintiff maintains that the policies require the warrant be obtained within 72 hours. (See doc. #69 at 14-15; Sanchez Exh. 20.)  The evidence does not support this assertion, however.  Although there is a general requirement that an officer has 72 hours to procure a warrant to keep a person incarcerated, this requirement does not apply for those arrested on FFJ warrants, but only for local charges.  (Sanchez Exh. 20.)  The policy contains a separate paragraph specifically dealing with FFJ charges, which does not contain any time limitations. (Id.)  Captain Eddings explained that the rules are different when they are dealing with an out-of-state warrant, as opposed to local charges.  (Eddings Dep. at 33-36, 38-39.)  He testified that there is no time period for obtaining the out-of-state warrant.  (Eddings Dep. at 33.)  He explained that the reason there is no designated time to obtain the warrant is because they are essentially at the mercy of the other out-of-state jurisdiction.  (Id. at 35-36.)

16

District Attorney received the FFJ packet from Deputy Allums, the District Attorney's office recommended that the FFJ warrant be issued on November 19, 2008.  (See Allums Dep. at 127-28; Sanchez Exh. 27.)

In the meantime, Sanchez's booking photograph was sent to the Kansas City, Kansas Police Department.  (See id.; see also Kansas City Police Department Investigative Addendum.) On November 18, 2008, an investigator from Kansas City took Sanchez's photograph to the alleged victim, who was Rafael Chavez's daughter. (Id.)  Both the alleged victim and Rafael Chavez's estranged wife "stated that they would be maybe 70-80% sure the photo could be the named suspect."  (Id.) Additionally, Rafael Chavez's estranged wife told the investigator that Chavez had "some past friends (unknown names) from Alabama."  (Id.)  His wife also told the investigator about some "identifiable markers", or tattoos, on the suspect to use for comparison to ensure he was the correct individual.  (Id.)  The Kansas City Police Department faxed this report to Jefferson County personnel on November 21, 2008, after the FFJ warrant had already been issued.  (Id.)  Although the report contained some identifying markers, no one from Jefferson County inspected Sanchez to confirm that he had these tattoos on his body.

### C.  Court Appearances and Release

Sixteen days after his arrest, Sanchez had his first court appearance on

Wednesday, November 26, 2008, the day before Thanksgiving. (Sanchez Dep. at 42.) However, Sanchez's attorney did not show up for the hearing. (Id. at 42-43.) Sanchez had a second court appearance a few days after Thanksgiving. (Id. at 43.) His lawyer told Sanchez that she "did not have enough proof" of the mistaken identity and that he "had to wait until another court date." (Id. at 44.)

Sanchez's third court appearance was on December 3, 2008. (Id. at 44-45.) At that court appearance the judge called Allums into court and asked her about identifying marks, including whether Sanchez had any tattoos. (Allums Dep. at 152-54.) The judge then had the bailiff take Sanchez into the bathroom and look for any tattoos. (Id. at 154-56.) When they returned the bailiff reported that Sanchez did not have any tattoos. (Id.) Sanchez was released from the Jefferson County Jail after this hearing. (Sanchez Dep. at 44-45.) In total, Sanchez spent twenty-three (23) days in the jail, including over Thanksgiving, based on the mistaken belief that he was Rafael Chavez, who was wanted in Kansas. (Id. at 39-40.)

## IV. Applicable Substantive Law and Analysis

Defendants contends that summary judgment is proper as to all claims asserted against them for the following reasons: (1)  sovereign immunity under the Eleventh Amendment as to claims asserted against her in her official capacity; (2) qualified immunity as to the federal claims asserted against her in her individual capacity; (3)

18

absolute immunity under Alabama law as to the state law claims; and (4) Sanchez does not have standing to pursue injunctive or declaratory relief.  (See generally Docs. # 60, 61 & 62.)  Before discussing these arguments, the court notes that Plaintiff admits that any § 1983 claims brought against Defendants Eddings, Hannah and Owens in their official[16] capacity for monetary damages are due to be dismissed. (Doc. # 67 at 14; Doc. # 68 at 13; Doc. #69 at 21.)  Additionally, Plaintiff states that he has not brought a claim for money damages under Alabama law against any of the Defendants.  (Doc. #67 at 22; Doc. #68 at 22; Doc. #69 at 35.)  Finally, Plaintiff states that he is not pursuing injunctive or declaratory relief against Defendants Hannah and Defendant Owens.  (Doc. # 67 at 22; Doc. #68 at 22.)

With those admissions,  two types of claims remain in this action.  The first type of claim is for money damages under section 1983  against Defendants Eddings, Hannah and Owens in their individual capacity.[17]  The second type of claim is for

---

[16]  The court notes that all three briefs actually states that Defendants are entitled to sovereign immunity as to Plaintiff's monetary claims in their "initial" capacity, but the court understands this error to be in their official capacity based on the case law and prior rulings in this case.

[17]  The federal claims are as follows: (1) false arrest; (2) false imprisonment and wrongful detention; (3) malicious prosecution; (4) improper policies and customs and procedures; and (5) failure to properly train.  (See Doc. #31,  Second Amended Compl.)

injective and declaratory relief[18] against Defendant Eddings only. For clarity's sake, the court addresses the claims against each Defendant below, taking the claims against the arresting officers first and then addressing the claims against Captain Eddings.

**A.  Deputies Jeffrey Hannah and Kevin Owens**

The only issue before the court regarding Deputies Hannah and Owens is whether they are entitled to qualified immunity on Sanchez's claims related to their actions on the night of Sanchez's arrest. Those claims include (1) false and mistaken arrest, (2) false imprisonment, and (3) malicious prosecution. (See doc. # 68 at 16-22.) The court concludes that Deputy Hannah and Deupty Owens are entitled to qualified immunity on all Sanchez's claims for the reasons stated below.

**1.  False Arrest**

Sanchez's false arrest claims are based on the actions of Deputies Hannah and Owens who mistakenly believed Sanchez to be a fugitive from Kansas against whom there as an outstanding felony warrant. It is undisputed that Sanchez was arrested and

---

[18]   The Second Amended Complaint asks the court to "Issue a declaratory judgment that the policies, practices, procedures, conditions, and customs of the Defendants violated the rights of the Plaintiff as secured by 42 U.S.C. Section 1983, the Fourth Amendment of the United States Constitution, the Fourteenth Amendment to the United States Constitution and the Eighth Amendment to the United States Constitution" and "grant the Plaintiff a permanent injunction enjoining the Defendants, those acting in concert with the Defendants and at the Defendants' request from continuing to violate the Constitution of the United States."  (Doc. #31 at 20.)

handcuffed as a direct result of mistaking Sanchez for Rafael Chavez.

To succeed on his § 1983 claim, Sanchez must establish that he suffered a deprivation of rights, privileges, or immunities secured by the Constitution and lows of the United States and that the act or omission causing the deprivation was committed by a person acting under the color of state law. Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005). That being said, however, the doctrine of qualified immunity can shield law enforcement officers from liability. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Under this doctrine, law enforcement officers are entitled to qualified immunity so long as the alleged civil damages arose from the officers' discharge of their discretionary functions and their conduct "could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987). Qualified immunity does not provide a mere defense to liability, but rather a complete immunity from suit. Saucier v. Katz, 533 U.S. 194, 200–01 (2001).

To claim qualified immunity, the officer first must show that he was acting within his discretionary authority when the alleged violation occurred. Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Once this is shown, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." Skop v. City of Atlanta, 485

F.3d 1130, 1137 (11th Cir. 2007). To avoid summary judgment on the basis of qualified immunity, the plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). These two inquiries must be followed in this order "to set forth principles which will become the basis for a [future] holding that a right is clearly established." Scott v. Harris, 550 U.S. 372, 372 (2007) (alteration in original) (quotation marks omitted).

It is undisputed that Deputies Hannah and Owens were acting pursuant to their discretionary authority when they arrested Sanchez.  Accordingly, the pertinent inquiry is whether the facts, when viewed in the light most favorable to Sanchez, establish that Deputies Hannah and Owens violated a constitutional right.  If they did not, then the inquiry is over and the deputies are entitled to qualified immunity. Saucier, 533 U.S. at 201.  On the other hand, if they did violate a constitutional right, then the court must determine if the right was "clearly established" at the time of the violation.  Id.

An arrest made without probable cause is unreasonable and in violation of the Fourth Amendment.  Such a violation of the Fourth Amendment may support a claim under 42 U.S.C. § 1983.  Rushing v. Parker, 599 F.3d 1263, 1265 (11th Cir. 2010);

22

Motes v. Myers, 810 F.2d 1055, 1059 (11th Cir. 1987). However, case law also holds that when a police officer has "probable cause to arrest one party, and [ ] reasonably mistake[s] a second party for the first party, then the arrest of the second party is a valid arrest." Hill v. California, 401 U.S. 797, 802 (1971) (citations omitted). "This 'reasonable mistake' standard applies (1) in the context of a section 1983 action and (2) when the police have a valid warrant—as opposed to just probable cause—to arrest someone, but mistakenly arrest someone else due to a misidentification." Rodriguez v. Farrell, 280 F.3d 1341, 1346 (11th Cir. 2002).  As in all such cases, the court "must evaluate the totality of the circumstances surrounding the arrest to determine its reasonableness."  Id. at 1347.  "A policeman's mistaken belief of fact can properly contribute to a probable cause determination and can count just as much as a correct belief as long as the mistaken belief was reasonable in the light of all the circumstances."  Id. (quoting United States v. Gonzalez, 969 F.2d 999, 1006 (11th Cir. 1992)).

The Rodriguez opinion is instructive.  In that case, Joe Rodriguez was riding as a passenger in a vehicle when the vehicle was stopped for a broken tag light. The driver of the vehicle was arrested shortly thereafter for drugs found in her purse. Rodriguez was ordered out of the vehicle by Sgt. Farrell and asked to produce

identification.[19]   Using this information, Farrell ran a warrants check through his dispatcher and obtained a name hit. Teletype communications to the dispatcher indicated three outstanding warrants for a man named Victor Heredia (Heredia), who used the alias "Joe Rodriguez."  According to the warrant, Rodriguez and Heredia had many of the same physical characteristics, including their age, hair color, and tattoos. However, Rodriguez was five inches taller than Heredia. Nevertheless, Rodriguez was arrested on the Heredia warrant and taken into custody. Thereafter, after a comparison of fingerprints, Rodriguez was released. Rodriguez subsequently filed suit pursuant to 42 U.S.C. § 1983 claiming his Fourth Amendment rights were violated by the unlawful arrest.  Rodriguez, 280 F.3d at 1343-45.

The Eleventh Circuit concluded that the arrest pursuant to a valid warrant was not outside the scope of a constitutionally permissible "reasonable mistake."  Id. at 1345-46.   The Court focused on the fact that Rodriguez's identifying information was identical to the information listed under the warrant in "four critical" aspects: the same name, sex, age, and race.  Id. at 1347. Additionally, their social security numbers were similar, they had addresses in neighboring  towns, were born in the

---

[19] Rodriguez provided the officer with more than ten pieces of identification, including a Florida driver's license, a birth certificate, military discharge papers, a social security card, credit card, and V.A. patient card.

24

same state.  Id.  As far as their tattoos, Rodriguez had no fewer tattoos than Heredia, and many of the tattoos were in the same location.  Id.  According to the Court, the only "material difference" was that Rodriguez claimed he was 5'11" tall, which was five (5) inches taller than the height listed on the warrant.[20]  Id.  The Court concluded that in the circumstances of that case, given the similarities, any mistake in the officer's estimate of Rodriguez's height was reasonable and did not equal a constitutional violation.  Id. at 1348.

Therefore, the question the court must answer is whether the mistaken arrest of Sanchez, based on a valid warrant, was outside the scope of "reasonable mistake." Id. at 1345-46. As in Rodriguez, the material identifying information provided by Kansas officials to the Jefferson County dispatch, and then to Deputy Hannah was the same: (1) they had the same first and last name; (2) they had the same date of birth; (3) they were the same race; and (4) they were the same sex.  Additionally, the warrant listed a height of 5'7" and weight of 180 pounds, and Sanchez's driver's license gave a height of 5'6" and Sanchez weight 185 pounds when he was booked

---

[20] The Court specifically discounted the other differences between the two men:

> We do not consider the other differences of much importance.  Eye color (given contact lenses), scars (given cosmetic surgery), and weight are all easily variable . . . .  This variability lessens the importance of differences in these characteristics.

Rodriguez, 280 F.3d at 1347 n.14 (citations omitted).

at the Jefferson County Jail. (Pl. Exh. 7, Dispatch Transcript at 13.)  Though  some of the identifying information, such as the social security number[21] and scars did not match, these differences are not controlling, according to Rodriguez.  Id. at 1347 n.14.   Simply put, there was no definitive information given to the deputies to indicate that Sanchez was not the subject of the warrant.   Deputies Hannah and Owens could still reasonably conclude that they had the right person such that the arrest should occur.

Therefore, in the context of this case, the court concludes that Deputies Hannah and Owens's mistaken arrest of Sanchez - pursuant to the execution, in the field, of a valid arrest warrant for Rafael Chavez - was not outside the scope of "reasonable mistake."   As such both deputies are entitled to qualified immunity on Sanchez's claims of false arrest.

## 2.  False Imprisonment and Malicious Prosecution

Section 1983 claims for false imprisonment and malicious prosecution are recognized as federal law claims under the Fourth Amendment.  Ortega v. Christian, 85 F.3d 1521, 1526 (11th Cir. 1996) (Section 1983 false imprisonment claim is grounded in Fourth Amendment guarantee against unreasonable seizures); Wood v.

---

[21] The court notes that Rafael Chavez had many listed social security numbers on the warrant, thus making it not unreasonable to discount another, different number.

Kesler, 323 F.3d 872, 881 (11th Cir. 2003) (Eleventh Circuit identifies malicious prosecution as violation of the Fourth Amendment and a viable constitutional tort cognizable under Section 1983).  However, an element of both claims is the absence of probable cause. Ortega, 85 F.3d at 1526 ("Where a police officer lacks probable cause to make an arrest, the arrestee has a claim under section 1983 for false imprisonment based on a detention pursuant to that arrest."); Wood, 323 F.3d at 882 (absence of probable cause is a required element of Section 1983 malicious prosecution claim).

Here, the officers had more than probable cause to arrest Sanchez; they had a warrant from Kansas and Kansas's statement that it would extradite him.   Because the court has already found that the mistaken arrest of Sanchez - pursuant to the execution, in the field, of a valid arrest warrant for Rafael Chavez - was not outside the scope of "reasonable mistake,"  his claim for false imprisonment and malicious prosectution based on that arrest fails.  See Wood, 323 F.3d at 882 (probable cause bars section 1983 malicious prosecution claim); Smedley v. Tripp, 2010 WL 5600133, *8 (M.D. Ala. 2010) ("As this Court has already found that arguable probable cause existed to arrest Plaintiff without a warrant, his claim for false imprisonment based upon that arrest also fails since Officer Tripp is entitled to qualified immunity."); Hogan v. City of Montgomery, 2006 WL 3052997, *6

27

(M.D.Ala. 2006) (holding that if defendant is entitled to qualified immunity of false arrest claim, then he is also entitled to it for false imprisonment claim); Colosimo v. City of Port Organge, 2005 WL 1421294, *6 (M.D. Fla. 2005) ("The existence of probable cause for [Plaintiff's] arrest necessarily bars his claim[] for false imprisonment and malicious prosecution.") Therefore, Deputies Hannah and Owens are entitled to qualified immunity on Sanchez's claims of false imprisonment and malicious prosecution.

### B.  Captain Ron Eddings

As stated above, Sanchez has two types of claims against Captain Eddings. The first type of claim is for money damages under section 1983.[22]  The second type of claim is for injunctive and declaratory relief.[23]  The court addresses each type of claim below.

---

[22]   The federal claims are as follows: (1) false arrest; (2) false imprisonment and wrongful detention; (3) malicious prosecution; (4) improper policies and customs and procedures; and (5) failure to properly train.  (See Doc. #31,  Second Amended Compl.)

[23]   The Second Amended Complaint asks the court to "Issue a declaratory judgment that the policies, practices, procedures, conditions, and customs of the Defendants violated the rights of the Plaintiff as secured by 42 U.S.C. Section 1983, the Fourth Amendment of the United States Constitution, the Fourteenth Amendment to the United States Constitution and the Eighth Amendment to the United States Constitution" and "grant the Plaintiff a permanent injunction enjoining the Defendants, those acting in concert with the Defendants and at the Defendants' request from continuing to violate the Constitution of the United States."  (Doc. #31 at 20.)

### 1.  Claims for Monetary Damages

As a supervisory official, Captain Eddings is only liable under § 1983 for the unconstitutional acts of his subordinates if (1) he personally participated in the allegedly unconstitutional conduct, or (2) his actions were causally connected to the alleged constitutional deprivation.  Campbell v. Johnson, 586 F.3d 835, 840 (11th Cir. 2009) (citing Tillman, 496 F.3d at 1328); Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990).  A causal connection may be shown by evidence of (1) "a custom or policy that results in deliberate indifference to constitutional rights," (2) "facts that support an inference that the supervisor[ ] directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so," or (3) "a history of widespread abuse" that notified the supervisor of the need to correct the alleged deprivation, but he failed to do so.  Tillman, 496 F.3d at 1328-29 (quotation marks, citation, and brackets omitted).  Regardless of the way the plaintiff attempts to establish the causal connection, "[t]he standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

### a.  Personal Participation

There is no evidence in the record that Captain Eddings personally participated in any aspect of Sanchez's arrest and/or incarceration.  In fact, the record shows that

29

Captain Eddings did not even learn about the arrest and incarceration until after Sanchez had been released from jail.    Merely being a supervisor does not equate with personal participation.  "'Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability.'"  Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir 1994) (quoting Hardin v. Hayes, 957 F.2d 845, 849 (11th Cir. 1992)).

### b.  Causal Connection

As stated above, there are three ways in which Sanchez can establish a causal connection between Captain Eddings's actions (or inaction) and the alleged constitutional violations.  In essence, Sanchez argues that the policies, procedures and customs in place during Sanchez's incarceration were deficient or non-existent, that Captain Eddings failed to prevent or stop his subordinates from committing constitutional violations, and that there may have been a history of widespread abuse to put Captain Eddings on notice of the need to change policies and procedures. (Doc. #69 at 25-29.)  Sanchez's arguments amount to attempts to establish the causal connection under all three methods, and the court addresses them separately below.

### i.  Policies, Procedures and Customs

As stated above, a supervisor may be liable under section 1983 "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional

rights." Harper v. Lawrence County, Ala., 592 F.3d 12227, 1236 (11th Cir. 2010).

"A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997). A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." Depew v. City of St. Mary's, Ga., 787 F.2d 1496, 1499 (11th Cir. 1986). An official, however, cannot be held liable for instituting a facially constitutional policy. Marsh v. Butler County, Ala., 268 F.3d 1014, 1036 (11th Cir. 2001) (en banc). The official can be held liable, however, if a facially constitutional policy is implemented in an unconstitutional manner. Goebert v. Lee County, 510 F.3d 1312, 1332 (11th Cir. 2007).

The heart of Sanchez's causal connection argument is that the policies, procedures and customs of the Jefferson County Jail resulted in the harm to Sanchez. Specifically, Sanchez argues that there were not any policies or procedures to check to ensure that the person who was arrested and jailed was the correct person from the warrant. (Doc. #69 at 26-28.) Further, Sanchez contends that there was an "inadequate policy when it was time to obtain the FFJ warrant, which was done at

least eleven days after Sanchez was incarcerated." (Id. at 28.)

The policies and procedures involved in the Sanchez arrest and incarceration are not comprised in one specific policy.  As pertaining to persons arrested under FFJ warrants, the record contains the following policies and procedures:

- "If a warrant, felony or misdemeanor, shows to be outstanding through NCIC/ACJIS, the warrant shall be confirmed. . . .  Before taking the subject into custody, every effort shall be made to ensure the subject is the one named in the warrant."  (Pl. Exh. 16 at Sanchez 56.)

- "A teletype from another State, requiring an arrest, will be the basis for a Fugitive From Justice Warrant.  The teletype commits the agency through the administration message to expedite.  The Fugitive Warrant shall be obtained if at all possible before the arrest is made. . . .  Law enforcement agencies within or outside the state requesting by telephone that an arrest be made, shall be advised to forward a warrant or teletype."  (Pl. Exh. 17 at Sanchez 575.)

- "Subjects arrested on Fugitive From Justice charges can be accepted from our agency on an Incarceration Form with a teletype from the issuing agency confirming their intention to institute extradition procedures."  (Pl. Exh. 20 at Sanchez 039.)

There is nothing inherently unconstitutional about these policies, and Sanchez does not argue that they are.  Instead, he contends that the policies were applied in an unconstitutional way in his case.  The court disagrees.

At every step from the minute Sanchez was pulled over and arrested  to the time he was released, the deputies did what they could to determine that Sanchez was the man wanted in Kansas.   As explained in detail, supra, Deputies Hannah and

Owens contacted dispatch regarding the match of the name from the outstanding warrant, and dispatch contacted the Kansas officials.  After relaying all the pertinent information, including the fact that Sanchez had nearly an identical name, the same birthday, and very similar physical descriptions, but lacked any scars,[24] the Kansas official told the dispatcher to have the deputies arrest Sanchez based on their warrant and the information given.  The decision to arrest and detain came from Kansas, and not pursuant to any policy, or lack of policy on behalf of the deputies or anyone at the Jefferson County Jail.  At the jail, Deputy Owens booked Sanchez based on the representation of the Kansas official that they would extradite Sanchez, pursuant to the policies in place.

Unfortunately, for Sanchez, there were many delays, which were not the fault of the policies and procedures in place.  For instance, it took Kansas seven  days to send the warrant to Deputy Allums at the Jefferson County Jail.  This delay was not the fault of any policy, procedure or custom on the part of the Jefferson County Jail or Captain Eddings. However, once Deputy Allums received the warrant from

---

[24] Sanchez repeatedly states in his brief that the information about the lack of tattoos was available to the arresting officers and to dispatch.  (Doc. #69 at 27.)  These statements are not only misleading, but are not supported by the record.  Instead, the record is clear that the information about the tattoos was sent in an addendum to the Jefferson County Jail, after the FFJ warrant had issued, but before Sanchez had his first court appearance.

33

Kansas, she did not delay in getting the information to the District Attorney,[25] as the FFJ warrant issued on November 19, 2008, two days after Deputy Allums got the information from Kansas.

Even before the FFJ warrant issued, additional steps were taken to make sure that Sanchez was the man wanted in Kansas. Sanchez's booking photograph was sent to the Kansas City, Kansas Police Department, and on November 18, 2008, an investigator from Kansas City took the picture to the alleged victim, who was Rafael Chavez's daughter. (See Kansas City Police Department Investigative Addendum.) Both the alleged victim and Rafael Chavez's estranged wife "stated that they would be maybe 70-80% sure the photo could be the named suspect." (Id.) Additionally, Rafael Chavez's estranged wife told the investigator that Chavez had "some past friends (unknown names) from Alabama." (Id.) His wife also told the investigator about some "identifiable markers", or tattoos, on the suspect to use for comparison to ensure he was the correct individual. (Id.) The Kansas City Police Department faxed this report to Jefferson County personnel on November 21, 2008, after the FFJ warrant had already been issued. (Id.)

Therefore, on February 21, 2008, Jefferson County personnel, specifically

---

[25] Deputy Allums took the information to the District Attorney's office the very same day she received the warrant from Kansas.

34

Deputy Allums, had information in her possession regarding the tattoos that clearly showed that Sanchez was not the man wanted by Kansas.  No one checked Sanchez for the tattoos until the Judge ordered it done at the court hearing on December 3, 2008, the day Sanchez was released.   This delay and lack of follow-through on the part of the Jefferson County personnel is the crux of Sanchez's claim.  Sanchez insists that his rights were violated when no one took the information from Kansas and looked to see if he had the identifiable tattoos.

What Sanchez's argument boils down to is that there should have been additional checks, after the arrest and while incarcerated, to ensure that he was the man wanted in the Kansas warrant.  If, for example, there had been a policy in place that required Deputy Allums to have Sanchez checked for tattoos when she received that additional identifiable information, maybe he would have been freed earlier. This is simply supposition, however.  The deputies at the Jefferson County jail do not have the ability to let a person go once they have been booked in the jail and an FFJ warrant has issued.  That is the responsibility of the District Attorney and/or a judicial officer.  Even if there were a policy in place that required Deputy Allums to update the FFJ file with the District Attorney's office when she received the addendum from Kansas personnel, there is still no guarantee that such a policy would have resulted in Sanchez's earlier release.

Although the court is sympathetic to Sanchez's situation, sympathy does not equate to finding Captain Eddings  personally liable for the events that occurred in late 2008.  Between the time the Jefferson County Jail was given the information about the tattoos and the time Sanchez was released a series of events occurred that no one had control over, and especially not the personnel at the Jail, but that kept Sanchez in jail for a longer period of time.  None of these delays were caused by a constitutional violation.  Therefore, Sanchez's causal connection claims fails as it relates to the policies, customs and procedures in place.

### ii.  Actions of Subordinates

A supervisor can be liable under section 1983 if he directs his subordinates to act unlawfully or if he knows that his subordinated would act unlawfully and does not stop them from doing so.  Harper v. Lawrence County, Ala., 592 F.3d 1227, 1236 (11th Cir. 2010).  Sanchez contends that Captain Eddings knew that his subordinates would act unlawfully and failed to stop them because of the lack of policies and procedures.  (Doc. #69 at 28-29.) This argument fails for two simple reasons.  First, there is no evidence in the record that Captain Eddings was aware about the Sanchez arrest until after his release, thus making it impossible for him to direct his subordinates to act unlawfully.  Second, as discussed in detail above, the court has concluded that the deputies did not act unlawfully.  As such, Sanchez failed to

36

establish a causal connection through this method.

### iii. Widespread Abuse

A supervisor can be liable under section 1983 where there is a history of factually-similar and widespread constitutional abuses that would put the supervisor on notice of the need to correct the problem, and he fails to do so. Braddy v. Florida Dept. of Labor & Employment Sec., 133 F.3d 797, 802 (11th Cir. 1998) (quoting Brown, 906 F.2d at 671). "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Brown, 906 F.2d at 671.

Sanchez contends that "[t]here is a question of fact as to whether there is a history of widespread abuse to put Eddings on notice." (Doc. #69 at 29.) Sanchez states that "[t]he testimony has established that similar incidents have happened between five to ten times," (id.) but does not give any citation to the record to support the statement. And, rightly so, as the record does not support this statement. Instead, the record before the court on this issue is comprised of the following: (1) Captain Eddings' testimony where he stated that he did not have any knowledge of any other case where the wrong individual was held in the Jefferson County Courthouse on an FFJ warrant (Eddings Dep. at 103-04; Eddings Aff. ¶ 4); and (2) Deputy Allums' testimony that there had been more than five but less than ten instances where there

37

was a question about someone's identity, but that it did not happen that often. (Allums Dep. at 165-66.)  There is no evidence that any of these cases, referenced by Deputy Allums, were cases where the inmate was not the person who was the subject of an out-of-state warrant.  (See id.)  Moreover, having a question about someone's identity does not equate with a misidentification.

Additionally, to be liable under the widespread abuse theory, the supervisor must have "actual or constructive notice of [a] flagrant, persistent pattern of violations."  Goebert, 510 F.3d at 1332;  Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999); Marsh, 268 F.3d at 1037 ("Unless a policymaker knows of the need [to remedy an unconstitutional condition], no liability can arise from failure [to do so].").  Sanchez has not shown that Captain Eddings had actual knowledge or constructive knowledge that any alleged constitutional violation had ever occurred in the past regarding the misidentification of inmates subject to a warrant.  In fact, Eddings testified that he was not aware of any other instance where the wrong individual was held in the jail based on an FFJ warrant.  (Eddings Dep. at 103-04.)

Therefore, for the reasons stated above, Sanchez failed to establish a constitutional violation on the part of Captain Eddings.  As such, summary judgment is proper on all Sanchez's claims against Captain Eddings in his individual capacity.

## 2. Claims for Injunctive and Declaratory Relief

Sanchez asks the court to impose injunctive relief in the form of a change in policies and procedures. (Doc. #69 at 36.) Defendant Eddings contends that Sanchez does not have standing to pursue injunctive or declaratory relief against him. (Doc. # 60 at 25-27.) It is well-settled law that the Eleventh Amendment does not prevent a plaintiff from pursuing prospective, injunctive relief against a state actor in the actor's official capacity. See Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004). But a plaintiff seeking such relief must demonstrate standing by showing he "has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct and that the injury or threat of injury must be both real and immediate and not conjectural or hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 101-102 (1983) (internal citations and quotations omitted). It is not enough that a plaintiff previously suffered an alleged wrong. See Powell v. Barrett, 496 F.3d 1288, 1308 n.27 (11th Cir. 2007) ("All Plaintiffs … had been released from the Jail before they were added as parties to the suit. We agree with the district court that the threat they face of future unconstitutional strip searches is too speculative or conjectural and not real and immediate.").

Sanchez contends that "there is a real and immediate threat that himself or another individual could be harmed by the failure of the Jefferson County Jail, under

the control of Captain Eddings[,] could be harmed if there is not a policy that provides for guidelines or checklists before an individual is booked on a Fugitive From Justice charge into the Jefferson County Jail." (Doc. #69 at 36.) The court disagrees. There is simply no evidence in the record to support Sanchez's argument. The threat of another arrest of Sanchez or any other individual based on a mistaken identity is too speculative or conjectural and not real and immediate. See Powell, 496 F.3d at 1318 n.27. In fact the testimony of Captain Eddings shows just the opposite. He testified that he did not have any knowledge of any other case where the wrong individual was held in the Jefferson County Courthouse on an FFJ warrant. (Eddings Dep. at 103-04; Eddings Aff. ¶ 4.) Sanchez did not submit any evidence to refute this testimony. Therefore, the court concludes that summary judgment is due to be granted on Plaintiff's claims for injunctive and declaratory relief against Captain Eddings.

**V. Conclusion**

In summary, the court finds that no material issues of fact remain and that Defendants Ron Eddings, Jeffrey Hannah and Kevin Owens are entitled to judgment as a matter of law as to all claims asserted by Plaintiff.

A separate order will be entered. Upon entry of that order the only remaining claim in this case will be the one pursued against the remaining Defendant Lynneice

Allums, which claim is subject to the existing stay because of the bankruptcy.  (<u>See</u>

Doc. #75).

      **DONE** this the   3rd   day of October, 2011.

_____

SENIOR UNITED STATES DISTRICT JUDGE